UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PRIME AID PHARMACY CORP., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 4:16-CV-1237 (CEJ) ) |
| EXPRESS SCRIPTS, INC., | ) ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant's motion to dismiss three counts of plaintiff's first amended complaint, pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiff has filed a response in opposition and the issues are fully briefed.

### I. Background

Plaintiff Prime Aid Pharmacy Corp. has operated in New Jersey as a licensed pharmacy providing retail and specialty medications[1] since 2006. Defendant Express Scripts, Inc., is a pharmacy benefits manager that provides services to insurance companies in the processing and payment of prescription drug claims. Defendant also provides mail order delivery of drugs through its own specialty pharmacy, Accredo Health Group, Inc. Plaintiff has been a member of defendant's network since 2006 and has filled tens of thousands of specialty medications for

---

[1] Specialty medications are "highly complex drugs, requiring particularized care, used in the treatment of patients suffering from severe chronic illnesses, including kidney disease, blood disorders, and cystic fibrosis." These medications can be "extremely expensive" and generally must be taken without interruption to avoid "life-endangering consequences." [Doc. # 33 at ¶21].

patients insured through plans managed by defendant. On July 25, 2011, the parties entered into the Provider Agreement that is at issue in this case.

In December 2013, new drugs for the treatment of Hepatitis C were introduced, to great patient demand. Plaintiff alleges that the introduction of these high-cost, high-profit-margin drugs "altered the relationship" between defendant and specialty pharmacies like plaintiff that were in competition with defendant's specialty pharmacy, Accredo. In April 2014, defendant audited plaintiff's records for the period between March 20, 2013 and April 1, 2014. Plaintiff produced its records for approximately 30,000 prescriptions filled during the audit period. On July 31, 2014, defendant issued a discrepancy report, based on a finding that plaintiff had submitted reimbursement claims for more syringe kits than it had received from its supplier, resulting to $142,845.72 in overpayments to plaintiff. At plaintiff's request, the supplier provided defendant with documentation supporting plaintiff's reimbursement claims.

On August 8, 2014, defendant notified plaintiff that it was being terminated from the provider network, effective August 22, 2014, pursuant to the Provider Agreement's "immediate termination" provision, § 4.2.c.[2] According to the notice,

---

[2] Section 4.2.c of the provider agreement states that defendant has the right to immediately terminate the agreement if:
> (i) Provider ceases to be licensed by the appropriate licensing authority; (ii) Provider submits a fraudulent prescription drug claim or any information in support thereof; (iii) Provider is insolvent, goes into receivership or bankruptcy or any other action is taken on behalf of its creditors; (iv) Provider routinely fails to designate on its claims submission and/or supporting documents the Information set forth in Section 2.3 or fails to comply with ESI's policies and procedures, including, but not limited to, the Provider Manual and/or quality assurance and/or utilization review procedures; (v) any representation to ESI or any response to a question set forth on the Provider Certification is untrue or becomes untrue; (vi) there is a change in ownership or control of Provider without ESI's prior written consent; (vii) ESI determines that the Provider is dispensing Covered Medications in violation of any

the termination was warranted by "serious violations" of the provider agreement, including the $142,845.72 discrepancy for syringe kits; plaintiff's failure to timely reverse seven reimbursement claims after patients failed to pick up prescriptions; and plaintiff's failure to notify defendant that it paid a $750 fine to the State of New Jersey in 2012.

On August 13, 2014, plaintiff responded to the termination notice and refuted each of the alleged violations.[3] Plaintiff stated that defendant's attempt to immediately terminate it from the network violated New Jersey law and demanded a hearing and a stay of termination for 90 days. In addition, plaintiff demanded immediate payment of over $8 million in funds due and owing to plaintiff.

In a letter dated September 12, 2014, counsel for defendant rejected plaintiff's assertion that it had not violated the provider agreement and denied

---

applicable law, rule and/or regulation; (viii) Provider is excluded from participating in any federal or state health care program; (ix) Provider fails to maintain insurance as required by Section 6.1 of this Agreement or fails to comply with its obligations set forth in [specified sections];(x) Provider breaches any of its representations and warranties set forth in this Agreement or the Provider Certification; (xi) Provider has not submitted a claim to ESI for ninety (90) calendar days; (xii) Provider (or any Pharmacy) fails to comply with any audit request, including the provision of information, made by ESI or any Sponsor or their designee, within the time period stated in such request; (xiii) a determination is made by ESI that Provider (or any Pharmacy) failed to document purchases of prescription drugs sufficient to support its claims for reimbursement to ESI; or (xiv) ESI determines that Provider's continued performance of services poses a risk to the health, welfare or safety of any Member.

Provider Agreement [Doc. # 35 at 13-14].

[3] Regarding the discrepancy report, plaintiff noted that the issue had been addressed, as described above. As to the seven instances in which patients allegedly did not pick up medications, plaintiff demanded the prescription numbers so that the allegation could be fully addressed. With respect to the fine paid to the New Jersey Board of Pharmacy, plaintiff reported that on October 31, 2011, a pharmacist allegedly filled a medication based on a phone call from a physician's office rather than a written prescription. The Board offered plaintiff "the opportunity to settle [the] matter <u>and thereby avoid the initiation of disciplinary proceedings</u>." [Doc. # 33-3 at p. 2 (emphasis in original)]. Plaintiff chose to pay the fine. The pharmacist was immediately terminated. [Doc. # 33-3 at p. 3].

3

plaintiff's request for a hearing and stay of termination. Furthermore, counsel stated that "[t]here are no additional monies being withheld by Express Scripts." [Doc. # 33-5]. Based on defendant's representation that it did not owe plaintiff any additional funds, plaintiff downsized its operations and laid off pharmacists, nurses, and salespersons.

On December 21, 2015, defendant forwarded plaintiff a check for $845,002.04, "representing the balance due to" plaintiff on claims dating back to 2013. The letter accompanying the check stated that defendant was continuing to withhold $968,233.56. [Doc. # 33 at ¶¶65-66, ¶68; Doc. # 35-3]. Defendant has refused plaintiff's request for an accounting of the funds.

In the first amended complaint, plaintiff asserts the following claims: fraudulent misrepresentation (Count I); breach of contract (Count II); breach of covenant of good faith and fair dealing (Count III); violation of the Missouri Prompt Pay Act (Count IV); unjust enrichment (Count V); promissory estoppel (Count VI); and equitable accounting (Count VII). Plaintiff seeks an award of compensatory damages and punitive damages.

Defendant moves to dismiss Counts I, IV, and VII.

**II. Legal Standard**

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint. Fed. R. Civ. P. 12(b)(6). The factual allegations of a complaint are assumed true and construed in favor of the plaintiff, "even if it strikes a savvy judge that actual proof of those facts is improbable." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007) (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002)); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule

12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (stating that a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of his claim. Scheuer, 416 U.S. at 236. A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; see id. at 563 (stating that the "no set of facts" language in Conley v. Gibson, 355 U.S. 41, 45–46 (1957), "has earned its retirement"); see also Ashcroft v. Iqbal, 556 U.S. 662, 678–84 (2009) (holding that the pleading standard set forth in Twombly applies to all civil actions). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

### III. Discussion

#### A. Count I — Fraudulent misrepresentation

Plaintiff claims that, in the September 12, 2014 letter, defendant fraudulently misrepresented that it was not withholding any additional monies that belonged to plaintiff. In reliance on the misrepresentation, plaintiff laid off several employees. Plaintiff alleges that defendant "had knowledge of, or was recklessly indifferent to, the falsity of" this statement when it was made. [Doc. # 33 at ¶75].

To prevail on a fraudulent misrepresentation claim under Missouri law, a plaintiff must prove: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's

5

reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury. <u>Stevens v. Markirk Constr., Inc.</u>, 454 S.W.3d 875, 880 (Mo. 2015).

Rule 9(b) of the Federal Rules of Civil Procedure requires that a party alleging fraud "must state with particularity the circumstances constituting the fraud . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The Eighth Circuit has held that the requirements of Rule 9(b) must be interpreted

> in harmony with the principles of notice pleading. The special nature of fraud does not necessitate anything other than notice of the claim; it simply necessitates a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct. Thus, a plaintiff must specifically allege the circumstances constituting fraud, including such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.

<u>Abels v. Farmers Commodities Corp.</u>, 259 F.3d 910, 920 (8th Cir. 2001) (quotations and citations omitted). "In other words, Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." <u>Summerhill v. Terminix, Inc.</u>, 637 F.3d 877, 880 (8th Cir. 2011). However, "[s]cienter . . . may be pleaded in conclusory fashion with the caveat that the party pleading fraud must set forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." <u>Nuss v. Cent. Iowa Binding Corp.</u>, 284 F. Supp. 2d 1187, 1194 (S.D. Iowa 2003) (citations omitted).

Defendant cites <u>Laidlaw Waste Sys., Inc. v. Mallinckrodt, Inc.</u>, 925 F. Supp. 624 (E.D. Mo. 1996), to support its contention that plaintiff has not sufficiently

pleaded that defendant made the challenged statement with knowledge of its falsity or ignorance of its truth. The plaintiff in Laidlaw operated a sanitary landfill site. Over a period of eight years, defendants shipped "filler cake" to plaintiff, certifying to plaintiff and the State of Illinois that the filler cake met the definition of non-hazardous waste. Id. at 628. Defendants later notified plaintiff that some of the shipped filler cake contained high levels of hazardous substances. Id. Defendants entered into a consent order with the State of Illinois to pay civil penalties, without admitting any wrongdoing. Plaintiff filed suit under federal environmental law and, as relevant here, asserted a claim for fraudulent misrepresentation, based on defendants' certifications that the "the waste was non-hazardous." Plaintiff alleged that the defendants "either (i) knew the waste was hazardous; or (ii) made the representations to plaintiffs in reckless disregard for their truth or falsity; and (iii) the waste was subsequently revealed to be hazardous." Id. at 635. The court found that these allegations lacked "specific supporting facts from which it can be inferred that defendants knew their representations were false when made, or made the representations recklessly, without knowing if they were true or false." Id.

The Court finds that the instant case is distinguishable. The Laidlaw defendants made multiple shipments over a number years, only some of which contained hazardous materials. In addition, the allegedly false certifications were made to the State of Illinois, as well as to the plaintiff, in the context of a highly regulated industry where the potential penalties for false statements could be severe, and yet the State's claim against the defendants was resolved without a finding or admission of fault. Based on these facts, it is readily apparent that additional allegations were necessary to support a reasonable inference that

7

defendants either recklessly or intentionally made false certifications. Here, by contrast, defendant made a single representation in response to plaintiff's demand for $8 million. This circumstance suggests that the representation was based on defendant's knowledge of the actual state of affairs. Furthermore, at the time the representation was made, defendant had allegedly terminated the Provider Agreement for pretextual reasons in order to eliminate plaintiff as a competitor to its own pharmacy for the sale of highly-profitable specialty drugs. Plaintiff has sufficiently pleaded that defendant made the challenged statement with knowledge of its falsity or ignorance of its truth. See Nestle Purina PetCare Co. v. Blue Buffalo Co., No. 4:14 CV 859 RWS, 2015 WL 1782661, at *11 (E.D. Mo. Apr. 20, 2015) (finding Rule 9 satisfied by "quite general" allegations that defendants "knew that their published statements were false, or acted in reckless disregard [or negligence] of the truth or falsity of the statements.").

Defendant also argues that plaintiff fails to adequately plead that it was justified in relying on the September 12, 2014 statement. "Generally, whether a party has justifiably relied on a misrepresentation is an issue of fact for the jury to decide." Renaissance Leasing, LLC v. Vermeer Mfg. Co., 322 S.W.3d 112, 132 (Mo. 2010). Here, plaintiff pleads that "the process of submitting claims to and receiving payment from" defendant is complex, and that as a result of the complexity and the volume of claims, plaintiff is unable to ascertain "what amounts and claims are outstanding, what claims [defendant] is refusing to pay and/or what amounts and claims [defendant] has paid." Thus, plaintiff relied on defendant to reconcile the claims. Plaintiff further alleges that defendant is in sole possession of the records regarding the amounts it paid and withheld on claims and the reasons for any

8

withholding of payment. [Doc. # 33 at ¶¶135-36]. Plaintiff has adequately pleaded that it justifiably relied on defendant's representation that it was not withholding any funds owed to plaintiff.

Defendant argues that plaintiff was not entitled to rely on the representation that no additional funds were due and was required to conduct its own investigation, citing Sherwin-Williams Co. v. Novak's Collision Ctr., Inc., No. 4:12CV02148 ERW, 2013 WL 5500107, at *4 (E.D. Mo. Oct. 3, 2013). The defendants in Sherwin-Williams brought a counterclaim for fraudulent misrepresentation based on the plaintiff's alleged promise that defendants could cancel a supply agreement without penalty. The court rejected the defendants' argument that they could rely on the promise because they had a "relationship of trust and confidence" with plaintiff. The court noted that "[e]nforcement of the provisions of a contract cannot be defeated by a mere showing that the other party gave assurances that the same would not be binding or enforced." Id. (citation omitted). Sherwin-Williams does not apply to this case. Defendant does not assert that under the terms of the provider agreement plaintiff was solely responsible for the accounting of its outstanding claims, such that any reliance on defendant's representation was unjustified. Furthermore, plaintiff specifically alleges that the "process of submitting claims to and receiving payment from defendant is complex" and that "it is impossible . . . to ascertain what amounts and claims are outstanding, what claims [defendant] is refusing to pay and/or what amounts and claims [defendant] has paid." [Doc. # 33 at ¶133].

The Court finds that the factual allegations sufficiently state a claim of fraudulent misrepresentation. Therefore, defendant's motion to dismiss Count I will be denied.

### B.  Count IV – Missouri Prompt Pay Act

Plaintiff alleges that defendant failed to timely and properly pay, dispute, or deny 104 claims that it submitted, in violation of the Missouri Prompt Pay Act (MPPA), Mo.Rev.Stat. § 376.383. The Act requires "health carriers" to notify a "claimant" within 30 days whether a claim (1) is a "clean claim" that does not require additional information before processing[4] — in which case the carrier must pay or deny the claim — or (2) requires additional information. Mo.Rev.Stat. § 376.383.3. If the claim requires additional information, the health carrier must take action within 10 days of receiving the requested information. See § 376.383.4 (after receiving additional information, health carrier must pay claim, deny claim and state the reason, or make final request for information).[5] The MPPA establishes

---

[4] A "clean claim" is one that "has no defect, impropriety, lack of any required substantiating documentation, or particular circumstance requiring special treatment that prevents timely payment." § 376.383.1(2).

[5] The relevant sections of the MPPA state:

> 3. Within thirty processing days after receipt of a filed claim by a health carrier or a third-party contractor, a health carrier shall send an electronic or facsimile notice of the status of the claim that notifies the claimant:
>     (1) Whether the claim is a clean claim as defined under this section; or
>     (2) The claim requires additional information from the claimant.
>
> If the claim is a clean claim, then the health carrier shall pay or deny the claim. If the claim requires additional information, the health carrier shall include in the notice a request for additional information. If a health carrier pays the claim, this subsection shall not apply.
>
> 4. Within ten processing days after receipt of additional information by a health carrier or a third-party contractor, a health carrier shall pay the claim or any undisputed part of the claim in accordance with this section or send an electronic or facsimile notice of receipt and status of the claim:

statutory penalties for failure to comply with the timing requirements. § 376.383.6. ("If the health carrier has not paid the claimant on or before the forty-fifth processing day from the date of receipt of the claim, the health carrier shall pay the claimant one percent interest per month and a penalty in an amount equal to one percent of the claim per day.")

Defendant argues that Count IV must be dismissed because the MPPA is not available to an out-of-state health care professional claiming reimbursement for services to non-Missouri residents. As defendant notes, for the purposes of the MPPA, a "health care provider" is defined as a "physician or other health care practitioner licensed, accredited or certified <u>by the state of Missouri</u> to perform specified health services consistent with state law." § 373.383.1(4) (<u>citing</u> § 376.1350 (19) and (20) (emphasis added)). However, the sections setting forth the time limits for health carriers to act apply to "claimants." A claimant is defined as "any individual, corporation, association, partnership or other legal entity asserting a right to payment arising out of a contract or a contingency or loss covered under a health benefit plan," without reference to the location of the claimant. § 376.383.1(1).

Defendant also relies on the Missouri Governor's Message issued on Feb. 24, 2010, which stated that the "legislation will help make sure Missouri's health care providers, hospitals and rural doctors will be paid more quickly . . ." [Doc. # 45-1].

---

(1) That denies all or part of the claim and specifies each reason for denial; or
(2) That makes a final request for additional information.

5. Within five processing days after the day on which the health carrier or a third-party contractor receives the additional requested information in response to a final request for information, it shall pay the claim or any undisputed part of the claim or deny the claim.

Mo.Rev.Stat. § 376.383.

"When construing a statute, the primary rule is to give effect to legislative intent as reflected in the plain language of the statute." City of Univ. City v. AT & T Wireless Servs., 371 S.W.3d 14, 18 (Mo. Ct. App. 2012) (citation omitted). "When the plain language of the statute is clear and unambiguous, [the courts] do not apply any other rule of construction." Id. Defendant does not identify any ambiguity in the statute that would permit the Court to rely on the governor's message to impose the limitation defendant seeks. Finally, even if the MPPA is limited to Missouri providers, plaintiff is licensed as a pharmacy in Missouri. See Missouri Bd. of Pharmacy "Pharmacy Primary Source Verification" [Doc. # 54-1].[6]

The Court finds that plaintiff has sufficiently stated a claim for relief based on the MPAA. The defendant's motion to dismiss Count IV will be denied.

### C. Count VII — Equitable Accounting

To state a claim for equitable accounting, plaintiff must plead (1) a need for discovery; (2) the nature of the accounts is complicated; (3) a fiduciary duty existed between the parties; and (4) plaintiff lacks an adequate remedy at law. Cook v. Martin, 71 S.W.3d 677, 679 (Mo. Ct. App. 2002). Defendant argues that plaintiff has failed to allege facts that establish the existence of a fiduciary relationship.

Under Missouri law, there is no specific list of factors which must be present in order to determine that a fiduciary relationship exists. McDonnell Douglas Corp. v. SCI Tech., Inc., 933 F. Supp. 822, 827 (E.D. Mo. 1996) (citing Matlock v.

---

[6] The Court may take judicial notice of the Missouri Board of Pharmacy verification. See Dittmer Properties, L.P. v. F.D.I.C., 708 F.3d 1011, 1021 (8th Cir. 2013). Defendant does not dispute the veracity of the Missouri Board of Pharmacy verification. See Fed.R.Evid. 201(b).

Matlock, 815 S.W.2d 110, 115 (Mo. Ct. App. 1991)). However, Missouri courts have identified basic elements which are generally necessary to the establishment of a fiduciary relationship, id., including:

> (1) one party must be subservient to the dominant mind and will of the other party as a result of age, state of health, illiteracy, mental disability, or ignorance; (2) things of value such as land, monies, a business, or other things of value, which are the property of the subservient party, must be possessed or managed by the dominant party; (3) there must be a surrender of independence by the subservient party to the dominant party; (4) there must be an automatic and habitual manipulation of the actions of the subservient party by the dominant party; and (5) there must be a showing that the subservient party places a trust and confidence in the dominant party.

Elkhart Metal, Fabricating, Inc. v. Martin, No. 14-CV-00705, 2015 WL 1604852, at *4 (E.D. Mo. Apr. 9, 2015) (citing A.G. Edwards & Sons, Inc. v. Drew, 978 S.W.2d 386, 394 (Mo. Ct. App. 1998)). The existence of a business relationship does not, without more, give rise to a fiduciary relationship. McDonnell Douglas Corp., 933 F. Supp. at 828 (citations omitted). "A fiduciary relationship may arise as a matter of law by virtue of the parties' relationship, *e.g.*, attorney-client" or, as plaintiff here argues, "as a result of the special circumstances of the parties' relationship where one places trust in another so that the latter gains superiority and influence over the former." Hibbs v. Berger, 430 S.W.3d 296, 312–13 (Mo. Ct. App. 2014) (citation omitted). In determining whether a fiduciary relationship existed, the ultimate question is "whether or not trust is reposed with respect to property or business affairs of the other." Id.

Plaintiff argues that a fiduciary relationship arose from the "complex nature" of the terms of the provider agreement. Plaintiff alleges that it submitted thousands

of claims to defendant, of which some have been paid and some have been denied on pretextual grounds. [Doc. # 33 at ¶ 132]. According to plaintiff,

> [t]he nature and process of submitting claims to and receiving payment from . . . Express Scripts is complex. Based on this complexity and the large volume of claims submitted by Prime Aid to Express Scripts, it is impossible for Prime Aid to ascertain what amounts and claims are outstanding, what claims Express Scripts is refusing to pay and/or what amounts and claims Express Scripts has paid.
>
> Based upon the complexity of Express Scripts' claims process, Prime Aid relied entirely on Express Scripts to reconcile the claims submitted to Express Scripts. Express Scripts retained sole discretion as to whether to deny or approve a claim; and, in the event of a denial, Express Scripts' unilaterally maintains a record of the specific grounds for denial. It also is in sole possession of records regarding amounts paid and withheld on claims submitted by Prime Aid, and in the event the claims are not paid in full, the specific basis for Express Scripts' withholding of funds.

[Doc. # 33 at ¶¶ 135-36].

Plaintiff also alleges that, in contravention of the industry standard, defendant has not provided a reconciliation to plaintiff of its claims. [Doc. # 33 at ¶¶138-39]. As a result, defendant has "significant" dominance over plaintiff. [Doc. # 33 at ¶138].

Defendant argues that the parties had a business relationship based in contract that precludes the creation of a fiduciary duty. Indeed, plaintiff acknowledges that the provider agreement "stipulates the parties are independent contractors." [Doc. # 33 at ¶133]. However, "an independent contractor may have a fiduciary relationship with the contractor if the contract contains terms that create that relationship." Bossaler v. Red Arrow Corp., 897 S.W.2d 629, 630–31 (Mo. Ct. App. 1995). Plaintiff has alleged that, by virtue of the complexity of the contractual relationship, defendant was able to deny claims or withhold payments without

providing a proper explanation. The Court cannot say at this stage of the proceedings that, as a matter of law, there was not a fiduciary relationship between the parties. See Crutcher v. Multiplan, Inc., No. 6:15-CV-03484-MDH, 2016 WL 6832644, at *6 (W.D. Mo. Nov. 18, 2016) (denying PPO administrator's motion to dismiss medical providers' claim for accounting until further discovery conducted); McDonnell Douglas Corp., 933 F. Supp. at 827–28 (subcontractor adequately pleaded existence of fiduciary relationship with contractor); see also Saey v. Xerox Corp., 31 F. Supp. 2d 692, 699 (E.D. Mo. 1998) (denying principal's motion for summary judgment on agents' fiduciary-duty claim, stating "The Court cannot determine from the Agreements that a fiduciary relationship did not exist between the parties as a matter of law.").

The Court finds that plaintiff has sufficiently stated a claim for equitable accounting. The motion to dismiss Count VII will be denied.

***

For the foregoing reasons,

**IT IS HEREBY ORDERED** that defendant's motion to dismiss [Doc. # 44] is **denied**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 18th day of January, 2017.